OPINION
Defendant-appellant, Forrest E. Dillon, appeals from a judgment of the Franklin County Court of Common Pleas finding defendant guilty of one count of aggravated murder in violation of R.C. 2903.01. Because the judgment of the trial court is supported by sufficient evidence and is not against the manifest weight of the evidence, we affirm.
By indictment filed October 22, 1998, defendant was charged with one count of aggravated murder in the death of Clark Haithcock. A jury trial commenced on April 25, 2000; on May 5, 2000, the jury rendered a verdict finding defendant guilty of aggravated murder. The trial court sentenced defendant to twenty years to life, and defendant appeals assigning two errors:
 I. FOREST [sic] DILLON'S CONVICTION WAS BASED UPON INSUFFICIENT EVIDENCE.
 II. FOREST [sic] DILLON'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Because defendant's two assignments of error are interrelated, we address them jointly. Together they assert the judgment of the trial court is not supported by sufficient evidence and is against the manifest weight of the evidence.
To the extent defendant challenges his conviction as not supported by sufficient evidence, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported.
When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins
(1997), 78 Ohio St.3d 380 ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting evidence"). Conley, supra. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230.
According to the state's evidence, Clark Haithcock was found dead in his home on July 29, 1998. On July 21, 1998, he had reported a stolen wallet and had said "Dillon" stole it. Columbus Police Officer Patrick Shrodes' investigation disclosed defendant's name. Shrodes approached defendant, who at first denied he was "Dillon," but eventually produced identification. Moreover, although he initially denied knowledge of the wallet, he admitted to knowing its location once he understood Haithcock did not intend to file charges against him. Never admitting he took the wallet, defendant climbed into a dumpster and retrieved the wallet for the officer. Although Haithcock had said the wallet contained eighty-one dollars, no money was found in it. Shrodes talked to defendant about the money and asked him to come up with it, but advised that defendant was not to go near Haithcock; instead, Shrodes would take the money to Haithcock.
At the time, defendant was working for Big Bob's Carpet, and on July 27, 1998, defendant advised Larry Carter, a friend who worked at the same place, that he needed help to pay back money to a man from whom he had stolen a wallet. At defendant's request, Carter wrote a check in the amount of $84 to "Clark Hancock," the name defendant gave him. On the same day, defendant and Haithcock called Carter to tell him the check was in the wrong name. Carter advised that the check should be returned and he would write another, but Haithcock did not want to release the check until he received one properly naming him as payee. Carter believed defendant was calling from Haithcock's house.
Defendant came to Big Bob's Carpet the next day, July 28. Carter gave defendant $84 in cash, even though the original check was not returned to him. Defendant advised he was going to pay Haithcock with the money. Defendant never returned the original check or paid back the money.
On July 27, 1998, between 7:00 and 7:30 p.m., Haithcock's next-door neighbor, Anna Kellison, heard two men yelling at Haithcock's home. More particularly, she heard Haithcock tell the other man to lay down the check on the table and get out of his house. The other man, whom she could not see completely, was a Caucasian wearing shorts. She next saw Haithcock at approximately 8:00 p.m. the next evening when they were talking to each other at his back door. Dorothy Hembree spoke with Haithcock at about 9:30 p.m. on July 28; Haithcock said he was waiting for people to come over regarding a gun he hoped to buy. Geraldine Willis, a friend who helped Haithcock with his daily routine, called him around 10:30 p.m., and again at 11:00 p.m., but received no answer. She went to his house the next day after work at about 3:30 or 3:35 p.m. and found him dead.
A neighbor saw defendant at Haithcock's home at approximately 5:30 p.m. on July 28. Through statements made to police officers, defendant advised he was home on July 28 from 8:30 p.m. to approximately midnight, when he went to bed. By contrast, Jeri Maynard, the daughter of the woman defendant lived with, said defendant left the house at about 7:00 p.m. on July 28 and was gone for approximately two hours. She said he came home, was there a "little bit," and left again for about a half hour. He returned not long after that, remained home not even fifteen minutes, then left again. He had not returned when she left at 9:45 p.m. On that day, he was wearing blue shorts with a Duke University logo. When she came back after midnight, defendant was there and was in the process of leaving.
Charles Zweibel, an inmate at the Orient Correctional Facility who was incarcerated due to his conviction for aggravated arson, stated defendant spoke with him about the murder of Haithcock. According to Zweibel, defendant was showing the approximately twelve people in the cell a piece of paper about a pair of shorts that were supposed to have had blood on them, but which were not returned properly to the property room; defendant believed he had "got the prosecutors" because the shorts were not properly returned. (Tr. 403.) Defendant also told Zweibel that he and his girlfriend were on crack cocaine on July 28 and wanted to buy more. According to Zweibel, defendant said he told her he knew where he could get some money, and so went to the house of an old man who was "sort of" blind and tried robbing him of money.
Zweibel said defendant stabbed the victim in the chest and slit his throat. At the time of the stabbing, the victim was in a chair or lounge chair. According to Zweibel, defendant further described the scene of the crime as including a wooden-handled knife in the sink that defendant tried to clean, two fans that were turned on, a television left on, and a safe with a throwaway rug on top of it. Defendant tried to get some money out of the victim, and ransacked a dresser looking for money. On top of the dresser was a wooden duck defendant had contemplated stealing. Defendant also told Zweibel the victim was blind: when defendant arrived the victim attempted to use the phone with very large numbers to call the police, as he recognized defendant's voice and wanted him out of the house because of the prior theft.
According to Columbus Police Homicide Detective Dana Farbacher, when he arrived at the scene he found a chair toppled over with a significant amount of blood. According to Farbacher, that indicated "the victim was up right and seated in the chair when he had begun to bleed and had only toppled over out of the chair after he bled for awhile." (Tr. 309.) Because defendant had such poor eyesight, the phone in the room had very large buttons, much larger than normally would be found in a home or office telephone. When Farbacher arrived at the scene, two fans and a television were operating. In the sink was a brown-handled kitchen knife which was collected to test the blood found on it. The top drawer of a dresser had been opened, and articles of clothing were hanging out of it; on top of the dresser was a wooden duck. In addition, a safe was found, covered with a rug.
The police ultimately confiscated defendant's blue shorts with the Duke University logo and, with the knife, sent them for DNA testing. With samples from both defendant and Haithcock, the knife and shorts were tested and revealed the DNA from the blood on the shorts and the knife matched the DNA of the victim, but not defendant.
The evidence construed in the state's favor is sufficient to support the trial court's judgment. Specifically, Zweibel's testimony, construed in favor of the state, contains defendant's admission that he committed the murder. Zweibel's testimony is bolstered by the evidence that the shorts defendant wore on July 28 were spotted with the victim's blood. Given defendant's prior involvement with the victim, the DNA evidence, and Zweibel's testimony, the state presented sufficient evidence that would allow reasonable minds to conclude defendant murdered Haithcock.
Similarly, the conviction is supported by the manifest weight of the evidence. Even if Zweibel's testimony is not construed in the state's favor, an examination of the totality of the evidence gives it credibility. More particularly, Zweibel was able to testify to many of the particulars of the scene of the crime which were not known to the public generally. He mentioned two fans and a television that were left on when defendant left the house, the ransacked dresser, the wooden duck, the safe with the rug, the telephone with large numbers, and the chair found toppled over in the victim's home. The murder weapon, a wooden-handled knife, was found in the sink, as Zweibel described. Defendant told Zweibel he stabbed the victim as he sat in a chair close to the phone, a scenario confirmed in Farbacher's testimony. While the jury was not required to accept Zweibel's testimony, the particulars that coincided with the crime scene lent credibility to his testimony and rendered the jury's decision to accept it a reasonable one.
Moreover, defendant was unable to successfully dispute the DNA evidence the state presented. Testimony from Maynard established that defendant wore the blue Duke University logo shorts on the evening of the murder. Testing of the shorts revealed blood stains with DNA that matched the DNA of the victim, but not of defendant. Similarly, the knife found in the kitchen sink had blood stains which revealed DNA matching that of the victim, not defendant.
Apart from the foregoing evidence, the state presented evidence of prior arguments between defendant and the victim. Defendant had stolen the victim's wallet on July 21, which resulted in an argument with the victim on July 27 as defendant attempted to repay the stolen money with a check made payable to the wrong person. Moreover, even if the prior disagreement did not provide a motive for the killing, Zweibel's testimony did. According to Zweibel, defendant went to rob Haithcock, whom he knew to have very poor eyesight, so that he could purchase additional crack cocaine.
Although defendant did not testify, his statement of his whereabouts the evening of the murder directly contradicted that of Maynard. While defendant stated he was at their home from 8:30 p.m. to midnight and then went to bed, Maynard testified to defendant's coming and going four different times between 7:00 p.m. and midnight.
Given Zweibel's testimony, corroborated in significant detail, the DNA evidence, and the evidence of motive, coupled with the discrepancy between defendant's statements and the evidence presented, the jury could reasonably determine that the state's evidence was credible and, based on that evidence, conclude that defendant committed the murder of Haithcock.
For the foregoing reasons, defendant's two assignments of error are overruled and the judgment of the trial court is affirmed.
BROWN and KENNEDY, JJ., concur.